<pre>
 1                UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .
 4   HMR FOODS HOLDING, LP,       .  Case No. 16-11540 (KJC)
     et al.,                      .
 5                                .
     . . . . . . . . . . . . . . .
 6   GONZALO CRUZ, et al., on     .  Adv. Pro. No. 16-51021 (KJC)
     behalf of himself and all    .
 7   other persons similarly      .
     situated,                    .
 8                                .
                  Plaintiffs,     .
 9                                .
     v.                           .
10                                .
                                  .
11   HMR FOODS HOLDING, LP,       .  Courtroom No. 5
     et al.,                      .  824 Market Street
12                Defendants.     .  Wilmington, Delaware 19801
                                  .
13                                .  Wednesday, May 23, 2018
     . . . . . . . . . . . . . . .  2:14 P.M.
14

15

                      TRANSCRIPT OF HEARING
16             BEFORE HONORABLE KEVIN J. CAREY
                 UNITED STATES BANKRUPTCY JUDGE
17

18

19

20
     ECRO:                     Al Lugano, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
</pre>

1 <u>APPEARANCES:</u>

2 For the Arlon Group:    Curtis Miller, Esquire
        MORRIS, NICHOLS, ARSHT & TUNNELL LLP
3         1201 North Market Street
        16th Floor, P.O. Box 1347
4         Wilmington, Delaware 19899-1347

5             -and-

6         Michael A. Petrino, Esquire
        KIRKLAND & ELLIS, LLP
7         655 Fifteenth Street, N.W.
        Washington, D.C. 20005-5793

8

9 For the Plaintiffs:    James E. Huggett, Esquire
        MARGOLIS EDELSTEIN
10         300 Delaware Avenue
        Suite 800
11         Wilmington, Delaware 19801

12             -and-

13         Sam Heldman, Esquire
           THE GARDNER FIRM, P.C.
14         2805 31st St NW
        Washington, D.C. 20008

15

16

17

18

19

20

21

22

23

24

25

INDEX

MOTIONS:                                                        PAGE

Second Amended Class Action Adversary Proceeding                  4
Complaint in Gonzolo Cruz on behalf of himself
and all other persons similarly situated, et al. v.
HMR Foods Holdings, LP and Arlon Group, LLC


Court's ruling                                                  24

Transcriptionist's Certificate                                 25

1    (Proceedings commenced at 2:14 p.m.)

2         THE COURT OFFICER:  All rise.

3         Be seated, please.

4         THE COURT:  Good afternoon, everyone --

5         COUNSEL:  Good afternoon.

6         THE COURT:  -- finally.

7         MR. MILLER:  Your Honor, for the record, Curtis

8  Miller of Morris, Nichols, Arsht & Tunnell, on behalf of

9  Arlon Group, LLP and Arlon Food and Agricultural Partners,

10  LP.

11         We're here on behalf of the Arlon Group's motion

12  to dismiss the second amended complaint.  With me in court

13  today, and will be making oral argument, is Michael Petrino

14  from Kirkland & Ellis, along with his colleague, Joshua

15  Browning.

16         THE COURT:  Very well.

17         MR. MILLER:  So, I'll turn the podium over to him.

18         THE COURT:  Okay.  Thank you.

19         MR. PETRINO:  Good afternoon, Your Honor.  Mike

20  Petrino, Kirkland & Ellis, for Arlon Group, LLC and Arlon

21  Food and Agricultural Partners, LP; I'll refer to them

22  collective as "Arlon."

23         Arlon is a private equity firm.  As this Court

24  knows, HMR is a portfolio company of Arlon.  It manufactured

25  read to eat foods and is now in liquidation after it suddenly

1   and unexpectedly lost its primary client and, unfortunately,

2   was forced to close its facilities and lay off workers.

3           Plaintiffs, now third complaint, alleges those

4   terminations violated both, the federal and California Warren

5   Acts and alleges that Arlon was a single employer with HMR.

6   The Court should grant Arlon's motion to dismiss with

7   prejudice for two reasons.  First, Plaintiff's federal claim

8   fails because they still have not alleged sufficient facts

9   that would allow the Court to draw the reasonable inference

10  that Arlon exercised de facto control over the terminations

11  at issue, which is the most important factor in the

12  governing, single employer test.

13          This complaint is essentially the same as the

14  prior complaint; they continue to rely on the conclusory

15  allegation that HMR's directors were acting in Arlon's

16  interests.  Now, to be sure, they have provided more

17  allegations with the aid of 50,000 pages of produced

18  documents, none of which are cited, but, Your Honor, quantity

19  is not quality and these additional allegations are merely an

20  attempt to manufacture a plausible allegation of de facto

21  control, but they are irrelevant or are merely consistent

22  with liability, which under Iqbal and Twombly, does not

23  amount to a plausible allegation that Arlon ordered the

24  terminations.

25          Plaintiff's second claim should fail for similar

reasons. Plaintiffs have now plausibly alleged a claim under the California Warren Act. The California Warren Act only imposes liability on employers who order the termination at issue. And plaintiffs have now plausibly alleged that Arlon ordered the plant shutdowns.

Further, Plaintiff's theory of strict liability is contrary to the text structure and history of the California Warren Act and should be rejected.

Your Honor, turning to familiar legal background, under the familiar Iqbal standard plaintiffs must plead sufficient factual matter --

THE COURT: You needn't go over the standard.

MR. PETRINO: Sure thing, Your Honor. Happy to skip that. And the relevant substantive standard, as Your Honor knows, are the five Pearson factors, so I'll go right to the analysis of the federal claim.

As this Court knows whether HMR or Arlon are a single employer is governed by Pearson in the Third Circuit's test in Pearson v Component Technology Corporation. The purpose of that Warren Act test, as Pearson states, is:

"Intended to -- excuse me -- intended to discover whether two separate entities actually functioned as a single business, particularly, with regard to labor policy."

So, plaintiffs have not attempted to allege two of the factors; unity of personnel policies or dependency of

1  operations.

2       And Arlon does not dispute two factors; that HMR

3  and Arlon have common ownership or that they have overlapping

4  directors and officers.  And, of course, those two factors

5  standing alone are not dispositive.

6       So, as Pearson and subsequent cases explain, the

7  most relevant factor is de facto control of the specific

8  employment practice at issue, which is the termination of

9  employees resulting from these plant shutdowns.

10      All right.  Plaintiff's operative allegation with

11  regard to de facto control in this complaint and in prior

12  complaints is that three of HMR's directors -- John Dutton,

13  Michelle Brooks, and Dan Weiner -- were a majority of the HMR

14  Board and were acting on behalf of Arlon, not HMR, when they

15  made the difficult, but necessary decision to wind down HMR's

16  business to close these plants and to terminate these

17  employees.

18      This third complaint does have more allegations in

19  it, but those allegations are -- some of them are wholly

20  irrelevant; for example, that Arlon hosted a breakfast for a

21  newly hired head of sales and marketing, but ultimately, the

22  main allegation, the central allegation of de facto control

23  over the relevant employment decision is still that Dutton,

24  Brooks, and Weiner were acting on behalf of Arlon, not HMR

25  when they made this decision, nothing more.

1        There's no allegation that Arlon -- there's no --

2  in this third complaint, there's no allegation that Arlon,

3  other than Brooks, Dutton, or Weiner, ordered the termination

4  -- the terminations at issue.  There's no allegation that

5  anyone at Arlon directed Brooks, Dutton, or Weiner to order

6  the terminations.

7        THE COURT:  What about the alleged absence of the

8  independent director through the decision-making process?

9        MR. PETRINO:  Yes, Your Honor.  I'm not sure --

10        THE COURT:  How should I do that?

11        MR. PETRINO:  Yes, sir.  Well, you should view

12  that allegation, as with all allegations, through its

13  relevance to de facto control over the decisions at issue.  I

14  don't think the complaint alleges that Mr. Pak (ph) was

15  absent through "the decision-making process" meaning, the

16  decision to order the terminations, right.  The complaint

17  does not allege that the decision was made without Mr. Pak

18  involved.

19        What the complaint allegations is that Mr. Pak was

20  not present at certain meetings or that Mr. Pak was not

21  included on one or two emails.

22        So, the way to view that is of a piece with

23  Plaintiff's other allegations that tend towards what they

24  appear -- the picture they appear to be trying to paint,

25  which is that Arlon was involved in the day-to-day operations

1 of HMR or that Arlon was somehow the alter ego of HMR; in

2 other words, those allegations are Plaintiff's attempt to

3 show that there was some lack of corporate formality.

4 And those allegations of lack of corporate form do

5 not go to the central factor, which is de facto control of

6 the termination decisions, all right. So, there are two

7 points and Plaintiff's opposition relies heavily on these and

8 focuses right in on their allegations of alleged lack of

9 corporate formalities.

10 And there's two points on, that Your Honor. The

11 first is that those allegations do not come close to alleging

12 a plausible claim that Arlon was an alter ego of HMR or that

13 this Court could plausibly conclude that the corporate form

14 should be disregarded under any of the familiar doctrines

15 under which corporate forms are disregarded.

16 So, now the Court has to analyze these facts in

17 terms of what is their relevance to the Pearson -- the

18 relevant Pearson factor, de facto control.

19 And none of these alleged instances where

20 corporate -- excuse me -- corporate formalities were not

21 allegedly scrupulously adhered to, go to the specific fact

22 issue, which is the termination decision. And I'll just get

23 right to it because the Plaintiff's opposition also focuses

24 in on the subjective views of Joe Reinert (ph), who was the

25 CEO of HMR. And they claim that because Joe Reinert viewed

Arlon or the Board's -- HMR's -- Arlon -- excuse me -- Arlon is his "boss" and referred to the Board as the "Arlon Board" that somehow Arlon was -- that either the corporate form was disregarded or Arlon was involved in the day-to-day operations of HMR.  And Reinert's subjective views on that topic do not go to, again, de facto control of the termination decision.

The only things plaintiffs have alleged on that score is what they alleged in the last complaint and what this Court found insufficient.  Another thing -- another tactic plaintiffs have used is to allege a number of allegations -- excuse me -- to include a number of allegations in their complaint for activities that entirely consistent with directors' duties; for example, retaining and discharging management or retaining a public relations firm for HMR, for taking an active role in the effort to try and save HMR's business once HMR's primary client notified HMR that it was no longer going to do business with them, all right.

Under Iqbal, allegations are not plausible if they rely on inferences that are contrary to the obvious alternative inference and here, not only is there an obvious alternative inference, but the Court can rely on the Delaware law presumption that Dutton, Brooks, and Weiner were acting in their capacities as HMR directors when they made those

1 decisions.

2 So, Your Honor plaintiffs have criticized Arlon in

3 their opposition for failing to look at the big picture.  But

4 in order to evaluate the big picture, courts in every

5 relevant case -- Consolidated Bedding, AFA Investments,

6 Pearson,  Jevic -- they have to analyze the specific

7 allegations.

8 And so, after analyzing the specific allegations,

9 what is evident is that plaintiffs have used the 50,000

10 documents, to which they had access through the trustee --

11 excuse me -- 50,000 pages, to which they had access, to adorn

12 their prior complaint with additional allegations that do not

13 advance the ball at all on their central allegation, which is

14 that the "Arlon agents:  Dutton, Brooks, and Weiner" were

15 acting with their Arlon hats, speaks for itself, and not

16 their HMR hats.

17 And that's the precise allegation that failed in

18 Consolidated Bedding.  It failed in AFA Investments.  And it

19 failed the first time around, Your Honor.

20 THE COURT:  What about confluence of the decision

21 to cease funding HMR and the decision to close it down.   In

22 theory, the decision to cease funding would have taken place

23 at the parent level, and even if -- even if you are right,

24 that the decision to close took place at the debtor level,

25 the decision was made by the same people or a core group of

1   the same people.

2          Can I not draw an inference from that?

3          MR. PETRINO: No, Your Honor. And the answer to

4   that is Pearson. In Pearson, GE Capital's decision to cease

5   funding, the company at issue there, Component Technologies,

6   directly resulted in their having to close -- to close and to

7   terminate employees, all right. And the Third Circuit held

8   that even though the termination of employees was the direct

9   result of a decision to call in a loan in that instance or to

10   cease funding or to cease funding the company, actually, that

11   that was not enough to engender Warren Act liability. And

12   that's precisely what we have here.

13          Another relevant case is Cleary v. American

14   Capital. That from the District of Massachusetts. In that

15   case, the Court was very clear that an investor can -- isn't

16   obliged to continue funding an investment that has -- that

17   looks as if it's turned bad and is allowed to protect its

18   investment.

19          I do want to perhaps address one thing that you

20   might be implying or that I'm, perhaps, not understanding in

21   your question, and that is who is the -- who decided not to

22   make the investment versus who decided to cease operations

23   for HMR. I don't think plaintiffs have -- I don't think

24   plaintiffs have alleged who decided -- in fact, they have not

25   alleged who decided not to fund HMR, to follow through with

1 the remainder of the $7.4 million that were promised from

2 Arlon to HMR.

3          But even if they were the same people, Pearson and

4 Cleary v American Capital give you a clear roadmap to a

5 holding that that does not engender Warren Act liability

6 under the federal act.

7          THE COURT:  Okay.

8          MR. PETRINO:  Okay.  If Your Honor -- I'd like to

9 move to the California claim now, if Your Honor doesn't have

10 any --

11          THE COURT:  Go ahead.

12          MR. PETRINO:  Feel free to ask me any questions.

13 I'm sure you will.

14          So, under the California claim, the Court should

15 dismiss the California Warren Act claim for similar reasons.

16 And, obviously, there's a dispute here among the parties

17 about what Section 1400(b) of the California Labor Code

18 means, all right.  That's the definition of employer.

19          But the Court doesn't even have to weigh in there,

20 all right.  If the Court looks at Section 1401(a) of the

21 California Labor Code, that states that an employer --

22 whatever an employer is, an employer may not order a mass

23 layoff, relocation, or termination at a covered establishment

24 unless 60 days before the order takes effect, the employer

25 gives written notice of the order and so on.

1    So, the bottom line is, the Court should dismiss
2  the California claim because plaintiffs have not alleged that
3  Arlon ordered the mass layoff.  And once you're discussing
4  "order," you're in a world that very much looks like de facto
5  control, under the federal Pearson standard.
6    And so that -- so that is the plain-meaning
7  approach to those two provisions, but going even further,
8  Your Honor, there's no indication in the legislative history
9  that California intended for Section 1400(b) to abrogate
10  bedrock -- the bedrock principle of corporate limited
11  liability.
12    What the legislative history, instead, shows is
13  that the purpose of California's act was to lower the
14  numerical thresholds for what constitutes a covered facility
15  and what constitutes a relevant termination so that
16  additional terminations not covered by the federal Act would
17  also require 60 days' notice.
18    And I'd also note that both, in AFA Investments
19  and Consolidated Bedding, Judge Walrath and Judge Shannon
20  respectively dismissed California Warren Act claims together
21  with federal claims.
22    And as a final point, Your Honor, to accept
23  Plaintiff's view that California law creates strict liability
24  for all corporate parents in the California Warren Act is a
25  catch-22, because in order to comply with the California --

1 creates a catch-22 and leads to absurd results.

2          Because, in order to comply with the California

3 Warren Act, a parent would have to inject itself into the

4 decision-making process and the process of laying off

5 employees.  But under the federal test, a parent is supposed

6 to keep an appropriate distance and not retain or inject

7 itself so that it has de facto control over that process.

8          So accept Plaintiff's view would create a

9 situation in which firms face a very difficult decision, and

10 I submit, a catch-22.  If Your Honor doesn't have any further

11 questions, I can address anything else on rebuttal.

12          THE COURT:  I do not.  Thank you.

13          MR. PETRINO:  All right.

14          MR. HUGGETT:  Good afternoon, Your Honor.  Jim

15 Huggett with Margolis, for the plaintiffs.

16          I'm glad to introduce Sam Heldman, from

17 Washington, D.C. who's co-counsel in the matter and I don't

18 believe has been in this courtroom or met you before.

19          MR. HELDMAN:  I've not.  Thank you, Your Honor.

20          THE COURT:  Oh, what a lucky guy he is today.

21          MR. HUGGETT:  If I may yield?

22          THE COURT:  Welcome, sir.

23          MR. HELDMAN:  Thank you, Your Honor.  By the way,

24 on the phone is my colleague from Alabama, Vance McCrary, who

25 the Court may have met before.

1       Let me just speak very briefly on the California

2  claim.  I'm proposing, unless the Court has other questions,

3  to speak more about the factual allegations than about legal

4  nuances.

5       But I just heard my friend on the other side say,

6  that now they're making argument, not about 14 -- Section

7  1400 of the California Labor Code, but Section 1401(a).

8  That's a new argument, I believe, that was not made in the

9  memorandum.  I don't feel like it's appropriate for me to

10  have to speak to that off the cuff.

11       If I do, I would say that what 1400(b), on our

12  reading, does is the same thing that the federal law does by

13  its own standards, which makes two entities into the employer

14  together.  So, the employer orders the shut down, no matter

15  who the employer is; it may be constituted of one or more

16  entities.  That's my off-the-cuff response to that new

17  argument.

18       And without going into all the nuances of <u>Iqbal</u> --

19  and I know the Court knows <u>Iqbal</u> and <u>Twombly</u> -- let me just

20  say, because I kept wanting to say it as the other side was

21  speaking -- it's not a summary judgment standard.  We don't

22  have to make allegations, much less detailed allegations,

23  that if true, would get us over summary judgment.

24       It's a standard short of that; it's the plausible

25  standard.  Is it plausible, in light of all the complaint as

1  a whole, with the inferences in our favor, those two

2  precepts, the complaint as a whole and the inferences in our

3  favor, are supported by the Third Circuit cases that we cited

4  in our brief. Is it plausible to think that we could

5  ultimately prove single employer? And in this case, it's

6  true, we do agree the de facto control test is really where

7  the rubber is going to meet the road on this motion.

8         We have alleged -- we've alleged it flat-out that

9  the -- that Arlon made the decision.

10         THE COURT: But there's nothing in the complaint

11  specifically that I could look to or that you could point me

12  to from which I could either conclude that or draw an

13  inference if that were so. What event, what circumstance,

14  what day, what discussion, what board action is referred to

15  in the complaint that tells me that Arlon made this decision?

16         MR. HELDMAN: And that, Your Honor, we haven't

17  cited to a board action or a particular communication as one

18  would, for instance, under Section -- under Federal Rule 9,

19  including fraud with particularity when -- and a detailed

20  pleading is not required.

21         But I understand the Court's question. I don't

22  mean to evade it. The Court may want to know, Well, even if

23  you can't point me to the communication, what's in here that

24  makes that allegation something that has the ring of

25  plausibility to it? I mean --

1            THE COURT:  Right.  Because as my civil procedure

2   teacher used to say, Saying it doesn't make it so; you've got

3   to give me more.

4            MR. HELDMAN:  And that's true, Your Honor, except

5   -- and, again, I don't want to argue Iqbal and Twombly; the

6   Court's dealt with it as many times as I have -- allegations

7   of fact are taken as true, still taken as true in a

8   complaint.

9            Now, there's that funny line between threadbare,

10  but it doesn't have to be detailed, right?  Well, I don't

11  know exactly where the Court comes down on what is something

12  that a threadbare, even though it doesn't have to get

13  detailed.

14           But let me get to the things that make it

15  plausible to think that Arlon did it.  Among the things we

16  know is this; that the Arlon-appointed Board members, when

17  one of their number dropped out, they didn't even bother to

18  convene a board meeting to replace him or do any of the

19  formalities about that.  They just kept on trucking.  Now, I

20  guess they had a three to one majority.

21           And when it came time to appoint a new -- they

22  decided it was time to appoint a new CEO of HMR, they

23  appointed a guy with a long-term -- a longtime employment

24  relationship with Arlon.  And they made that decision --

25           THE COURT:  Okay.  So, let me ask you to pause

1   there.

2               MR. HELDMAN:  Yes.

3               THE COURT:  It is a very customary practice for PE

4   firms to place people from time to time in their different

5   portfolio companies.  What makes this different?

6               MR. HELDMAN:  I don't know that it's -- I don't

7   know that the Court is wrong and I would also say that the

8   fact that it may be common does not mean that it's not an

9   indicator of a plausible case for liability.

10              And if we go back to Pearson, the Third Circuit in

11  Pearson -- and there's a passage in there that says, Don't

12  put too much emphasis on whether the lender is behaving

13  typically, for what lenders typically do.  Typicality, they

14  say, is a malleable and mutable concept and, you know, Courts

15  kind of make things typical or not by saying they're great or

16  saying they're not so.  Again, don't focus on typicality so

17  much.

18              Typically-done things can be part of what makes an

19  allegation plausible.  But it's not just that this fellow was

20  an Arlon guy, it's that the three Arlon agents, we call them,

21  installed him without even calling a Board meeting, without

22  even telling Mr. Pak.  They made the decision.

23              And then, according to complaint, at a Board

24  meeting a few weeks later, there was a resolution drafted by

25  an Arlon employee to sort of ratify this.  And then you have

1 Mr. Reinert, he comes in and the complaint alleges that he

2 comes in knowing and understanding that Arlon was in complete

3 control of HMR, and this is in Paragraph 21(n), as in Nancy,

4 on Page 10.  He knew that they expected him to do his job in

5 the interests of Arlon, rather than the interests of HMR, and

6 he agreed to that.

7 And as my friend on the other side said, He also –

8 – you know, he also referred to who's in charge –– this is

9 Paragraph O –– who's in charge?  Who were the ultimate

10 decision-makers here:  The "Arlon Board."

11 Now, it is possible to suggest some inferences in

12 which that is an innocent misspeaking, an innocent

13 colloquialism; oh, he just meant the Board which happens to

14 be made up of a majority of people who are also affiliated

15 with Arlon, but are now wearing their HMR hats.  Maybe that's

16 what you inferred he met.

17 I would suggest that there's another inference:

18 that he meant exactly what he said; either that what happens

19 at HMR is up to Arlon's own governing body or ––

20 THE COURT:  But isn't that true, ultimately, with

21 any parent-subsidiary relationship?

22 MR. HELDMAN:  I think that to the extent that the

23 parent dictates a decision like this, well, that is de facto

24 control.  So, I don't know enough to say that it's true in

25 all instances or not, but when that power exists and is

1  exercised, well, that's exactly what <u>Pearson</u> tells us is

2  critical to single-employer liability.

3        So, Paragraphs N and O, I think, are very

4  critical.  Also, there's the fact that when things started

5  going south and HMR's main client started to pull away,

6  Arlon's lawyer got with them -- got with the client.  Arlon's

7  -- you know, two of the Board members are Arlon Board

8  members, but not Mr. Pak.  He's not even -- they don't even

9  let him know what's going on.

10       Arlon jumps in, right, and I'm not saying that's

11 nefarious.

12       THE COURT:  How do you know that he did not know

13 what was going on?

14       MR. HELDMAN:  He was not -- I say that as an

15 inference from the fact that in Paragraph 21(t), Reinert let

16 Dutton, Brooks, and Weiner know, but he did not bother to

17 include Pak in the communication.  So, I was inferring from

18 that allegation, Your Honor.

19       Now, again, I'm not saying that all of this is

20 nefarious, because nefarious is not the question.  We don't

21 have to prove that they were evil or violating some external

22 source of corporate law for it to be a de facto exercise of

23 control, but we do have to say is just enough to make it

24 plausible.

25       Is it plausible that Arlon was really calling all

1  the shots here, including the shot of, We're not going to put

2  in any more money and we're going to shut it down.  And, you

3  know, not to belabor it too much, I respectfully suggest to

4  the Court that that is plausible on this whole set of facts.

5          I won't repeat it all.  I'd love to answer any

6  further questions that the Court has.

7          THE COURT:  I don't have any.  Thank you.

8          MR. HELDMAN:  Thank you.

9          THE COURT:  Briefly.

10         MR. PETRINO:  Yes, Your Honor.  First, on the

11 California claim, the argument about Section 1401(a) is in

12 Paragraph 65 of our memo and it's also in Paragraph 29 of

13 Arlon's reply.  That's not a new argument raised from the

14 podium.

15         On federal claim, plaintiffs have acknowledged

16 that they flatly alleged that Arlon -- Arlon's influence was

17 only through the directors of HMR, Dutton, Brooks, and

18 Weiner, and they've admitted that they haven't alleged any

19 additional facts; that's very important.  Instead, what

20 they've tried to do through this complaint is take the

21 insufficient allegation, which is Court has already ruled to

22 be insufficient and adorned it -- attempted to create smoke

23 so that the Court might try to find the fire of plausibility

24 within this complaint.

25         And opposing counsel summarized the argument by

1  referring to it as, They're trying to plausibly allege that

2  Arlon was "calling the shots."  And so, if they were calling

3  other shots, then this Court should then infer that Arlon was

4  directly responsible for the decision to terminate these

5  employees.

6           And that's not an inferences this, this Court has

7  to draw from this scattered-shot application of facts.  The

8  Court doesn't -- it is true, it's absolutely true that facts

9  pled are accepted as true, but inferences from facts do not -

10 - the plaintiffs' inferences from those facts do not have to

11 be accepted as true.  They especially don't have to be

12 accepted as true when there's an obvious competing inference,

13 especially one that is consistent with Delaware presumptions

14 that directors are operating consistent with their fiduciary

15 duties and in their capacity as directors.

16          And so plaintiffs attempt to create this picture

17 of Arlon's involvement through various facts that have

18 nothing to do with de facto control, does not rise to a

19 plausible allegation.  The Court cannot reasonably draw that

20 inference from these scattered allegations.

21          And I just want to end on one point, and that is

22 opposing counsel was saying that -- appeared to be saying

23 that de facto control just means control, generally.  Pearson

24 is very clear: de facto control means de facto control of the

25 employment practice that allegedly gives rise to liability.

1          It's not just some general assessment of control.

2    And even if it were a general assessment of control, Arlon

3    did not control the day-to-day activities of HMR, according

4    to the allegations in this complaint, which alleged one-off

5    or two-off instances where HMR directors were providing

6    advice or attempting to save the company were, otherwise,

7    acting entirely consistent with their obligations.

8          Thank you, Your Honor.

9          THE COURT:  Thank you.  All right.

10          I want to thank counsel for their submissions.

11    They were all very good.  I appreciate the argument, as well;

12    it's been helpful to me.

13          I will take this matter under advisement and issue

14    a decision in due course.

15          Anything else for today?

16          MR. PETRINO:  No, Your Honor.

17          THE COURT:  All right.  Thank you very much.  That

18    concludes this hearing.  Court will stand adjourned.

19          Safe travels home.

20        (Proceedings concluded at 2:46 p.m.)

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.


/s/ William J. Garling                    May 24, 2018

William J. Garling, CET**D-543

Certified Court Transcriptionist

For Reliable