## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| **HMR FOODS HOLDING, LP, *et al.*,**[1] | : | Case No. 16-11540 (KJC) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
| **GONZALO CRUZ, *et al.*,** on behalf of himself and | : | |
| all other persons similarly situated, | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 16-51021 (KJC) |
| v. | : | (Related Adv. D.I. 74) |
| | : | |
| **HMR FOODS HOLDING, LP, *et al.*,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

### OPINION[2]

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Defendants Arlon Group, LLC ("Arlon") and Arlon Food and Agriculture Partners, LP

("AFAP")[3] move to dismiss[4] the claims asserted against them in the Second Amended Class

Action Adversary Proceeding Complaint[5] filed by Gonzalo Cruz and other similarly situated

employees (the "Plaintiffs").  The Plaintiffs allege that HMR and the Arlon Defendants closed

HMR's facilities without prior notice to employees in violation of the Worker Adjustment and

---

[1] The Debtors in these jointly administered chapter 7 cases are HMR Foods Holding, LP ("HMR"); Huxtable's Kitchen, Inc.; HMR Foods, LLC; Huxtable's Kitchen Holding Corp.; and Simmering Soup Kitchen, LLC (the "Debtors").

[2] This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).

[3] Arlon and AFAP are referred to herein as the "Arlon Defendants" or "Movants."

[4] Adv. D.I. 74. Docket items in this adversary action are referred to herein as "Adv. D.I. #" and docket items from the main bankruptcy case are referred to herein as "Bankr. D.I. #."

[5] Adv. D.I. 67 (the "Second Amended Complaint" or "SAC"). At this stage of the litigation, the Plaintiffs have not yet requested class certification pursuant to Fed.R.Bankr.P. 7023.

Retraining Notification Act ("WARN Act") and the California WARN Act.[6] The Arlon Defendants assert that the Second Amended Complaint does not adequately allege facts to support the theory that they should be held liable as a "single employer" with HMR. The Court previously granted the Arlon Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Adversary Proceeding Complaint without prejudice and with leave to amend. The Second Amended Complaint is the third time the Plaintiffs allege single employer liability under the federal WARN Act and employer liability under the California WARN Act against the Arlon Defendants.

The Court heard oral argument on the motion to dismiss the Second Amended Complaint and took the matter under advisement. For the reasons stated below, the Court will grant the Arlon Defendants' motion to dismiss.

## FACTUAL ALLEGATIONS

Plaintiff Gonzalo Cruz was one of 316 employees permanently laid off when the HMR facility located in Vernon, California shut down on May 2, 2016.[7] On the same date, plaintiff Beth C. Fitzsimmons was one of 187 employees permanently laid off when the HMR facility located in Cumberland, Rhode Island, shut down.[8] The State of California and the State of Rhode Island received notice of the facility shut downs after the effective dates of the employee terminations.[9] On June 24, 2016, HMR filed a voluntary chapter 7 bankruptcy petition. Plaintiffs assert claims

---

[6] The WARN Act, 29 U.S.C. §§ 2101-2109, provides that an employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order to each representative of the affected employees. The California state legislature enacted the similar California WARN Act, Cal. Labor Code §§ 1400-1419.9, to supplement the federal WARN Act with stronger worker protections. *The Int'l Bhd. of Boilermakers v. NASSCO Holdings, Inc.*, 17 Cal. App. 5th 1105, 1122-23 (Cal. Ct. App. 2017).

[7] SAC ¶¶ 6, 11, 14.

[8] *Id.* ¶¶ 7, 12, 17. The California and Rhode Island facilities are referred to jointly in the Complaint as the "Facilities."

[9] *Id.* ¶¶ 16, 18.

on behalf of themselves and other similarly situated former employees as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), made applicable here pursuant to Fed. R. Bankr. P. 7023.

HMR is a Delaware limited partnership that was in the food manufacturing business.[10] Movants Arlon, a Delaware limited liability corporation, and AFAP, a Delaware limited partnership, are both subsidiaries of Continental Grain Company.[11] HMR's parent company (HMR Foods, LLC) is 100% owned by its sole member and parent, AFAP.[12] HMR is one of Arlon's portfolio companies.[13] Plaintiffs allege that Arlon and AFAP indirectly owned HMR, but directly operated and controlled all executive business decisions related to HMR, which include authorizing HMR's bankruptcy filing and ordering the shutdown of HMR's facilities.[14]

Plaintiffs describe an overlap of formal management teams between HMR, Arlon and AFAP, noting that (i) Michelle Brooks (managing principal of Arlon, agent of AFAP, and managing principal of AFAP's general partner), (ii) John Dutton (operating partner of Arlon), and (iii) Daniel Weiner (vice president of Arlon and agent of AFAP) were all members - - and a controlling majority - - of HMR's board of directors.[15]

The Plaintiffs allege that the HMR Directors failed to observe corporate formalities and maintain an arm's length relationship with HMR.

- In 2015 and 2016, Arlon and AFAP, through the [HMR Directors], failed to observe corporate formalities with regard to HMR and failed to maintain an arm's-length relationship with HMR. For example, during the period January 2016 through May 2016, Alex Santos, an Arlon employee who held no position with AFAP or HMR as an employee, officer or director, was

---

[10] *Id.* ¶ 5.

[11] *Id.* ¶ 10.

[12] *Id.* ¶ 21(b).

[13] *Id.* ¶ 9.

[14] SAC ¶ 21(a). The SAC does not allege that Arlon has a direct ownership interest in HMR.

[15] The Second Amended Complaint refers to Brooks, Dutton and Weiner collectively as the "Arlon Agents," which has a negative connotation, as the Plaintiffs fully intended. Each of the so-called "Arlon Agents" was also an HMR board member. Brooks, Dutton and Weiner will be referred to collectively herein as the "HMR Directors."

regularly included in communications between the [HMR Directors] and HMR management. Further, during the period January 2016 through May 2016, Alex Santos drafted and circulated HMR Board resolutions. The 2016 HMR Board Resolutions drafted by Alex Santos of Arlon included after-the-fact resolutions for actions taken weeks and/or months before by the [HMR Directors], including the replacement of HMR's former CEO, Lewis McLeod with Joe Rainert ("Rainert"), as HMR's new CEO in April 2015.[16]

- The [HMR Directors] went to the Cumberland Facility on a number of occasions during the first half of 2016. Sometimes, while on-site at the Cumberland Facility and un-accompanied by Jay Pack (who was the only HMR Board member who was not an Arlon principal or employee) the [HMR Directors] would hold a board meeting.[17]

- From January 2016 through May 2016, . . . Jay Pack ("Pack") was the only HMR Board member who was not an Arlon principal or employee. During this same time period, the [HMR Directors] disregarded corporate formalities and often simply did not include Pack on calls and emails where they were making decisions for HMR. On the rare occasions when Pack was included by the [HMR Directors] in discussions involving decision-making for HMR, Pack would simply rubberstamp whatever Arlon and AFAP asked him to approve, including an after-the-fact resolution to hire Rainert as HMR's CEO.[18]

- After Rainert learned that HMR's primary client was dropping HMR, he immediately reached out to Dutton, Brooks and Weiner [the [HMR Directors]] to give them the news, but did not bother to include Pack in the communication.[19]

- Following this, Brooks edited and approved a communication to be sent to the primary client concerning its decision to discontinue business with HMR. The communication was to be signed and sent by Rainert. Once again, Pack was not included in the exchanges about the communication to the primary client, nor was he even in the loop about the events that had transpired with the primary client.[20]

The Plaintiffs further assert that the HMR Directors were perceived to be representatives of Arlon and AFAP, and not HMR.[21]

---

[16] *Id.* ¶ 21(g).
[17] *Id.* ¶ 21(j).
[18] *Id.* ¶ 21(s).
[19] *Id.* ¶ 21(t).
[20] SAC ¶ 21(u).
[21] *Id.* ¶ 21(k).

- The HMR executives who reported to the Cumberland Facility understood the control (both financial and otherwise) held by Arlon and AFAP over HMR and recognized them as the ultimate decision-maker for HMR. These HMR executives answered to the [HMR Directors], in their capacity as representatives of Arlon and AFAP, and complied with their requests and instructions whether they were on-site or not.[22]

- Employees at the Cumberland Facility would always be told by HMR executives the day before any appearance by one or more of the [HMR Directors] that "Arlon" was coming and that employees should look their best. Conversely, the [HMR Directors] were never announced or introduced by HMR executives to employees as the "HMR Board members."[23]

- Arlon and AFAP, through the [HMR Directors], controlled and set terms and conditions of employment and compensation for management employees of HMR. One such HMR management employee indicated that he was happy to join the "Arlon Team" after negotiating his HMR executive employment terms with one of the [HMR Directors].[24]

Plaintiffs also allege that the Arlon Defendants maintained financial control over HMR.

- At all relevant times, and in particular during the first half of 2016, Arlon and AFAP maintained financial control over HMR. In or about March 2016, HMR needed a cash infusion in order to continue to operate. Arlon's investment committee approved a cash infusion of $7,400,000 requested by HMR, but provided less than half of that amount to HMR in March 2016. Arlon and AFAP, through the [HMR Directors], determined in their sole discretion, and in the interests of Arlon and AFAP rather than in the interests of HMR, when (and whether) to dole out any portion of the remainder of the cash infusion that had been approved, rather than providing the full amount that had been approved for HMR's use. Arlon and AFAP, through the [HMR Directors], never released the remainder of the approved cash infusion even though they knew that HMR desperately needed the remainder of the approved cash infusion in order to continue operations at the Facilities.[25]

---

[22] *Id.* ¶ 21(j). The SAC contains a similar allegation regarding the HMR Directors' visits to the California Facility. *Id.* ¶ 21(l).

[23] *Id.* ¶ 21(k).

[24] *Id.* ¶ 21(m).

[25] *Id.* ¶ 21(h).

Plaintiffs further allege that Arlon and AFAP, through the HMR Directors, interacted with HMR on a weekly, if not daily, basis, instructing HMR on operations, regulatory compliance, and communications with regulatory agents and HMR's primary client.[26] In particular, the Plaintiffs allege that:

- Brooks provided instruction concerning steps to be taken by HMR related to USDA audits at certain of the Facilities.[27]

- Michael Mayberry, general counsel of Arlon and Continental Grain Company, was the regulatory contact person to whom notice was to be given in the event of a food safety event at HMR requiring notification.[28]

- The [HMR Directors], instructed HMR's CFO to provide extensive financial information to them on a weekly or more frequent basis. The CFO's gathering and provision of such information on such a regular basis took up a significant portion of his time.[29]

- In 2016, the [HMR Directors] interviewed prospective hires to fill the position of HMR's head of sales and marketing. Upon the [HMR Directors]' final approval, their preferred candidate was hired. Once hired, the new head of sales and marketing for HMR was introduced at HMR at a breakfast hosted by Arlon.[30]

- In 2016, Arlon and AFAP, through the [HMR Directors], selected and instructed their own legal counsel to communicate with HMR's primary client once that client indicated its intent to terminate its business with HMR.[31]

- Arlon and AFAP, through the [HMR Directors], set the terms and conditions of employment and compensation for management employees of HMR.[32]

- Arlon and AFAP, through the [HMR Directors], replaced HMR's CEO approximately one month before commencing the mass layoff(s) or plant closing(s) at the Facilities, with Joe Rainert. Rainert had a longstanding employment relationship with Arlon prior to being handpicked and hired by the [HMR Directors] as the final CEO of HMR. . . . Before and after he became CEO of HMR, Rainert knew that the [HMR Directors] expected him

---

[26] SAC ¶ 21(i).
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] SAC ¶ 21(m).

to act in the interests of Arlon, AFAP and their parent, Continental Grain Company, rather than HMR. Rainert agreed to do so and understood that Arlon was in complete control of HMR. Rainert viewed John Dutton as his boss, by virtue of John Dutton's position with Arlon. [33]

Finally, the Plaintiffs allege that on or before May 1, 2016, Arlon and AFAP, through the [HMR Directors], "instructed [HMR's CEO] to conduct a mass layoff or shutdown at each of the Facilities following the [HMR Directors'] failed attempt to repair the long-damaged relationship with HMR's primary client."[34]

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a short and plain statement showing that the pleader is entitled to some relief.[35] The pleading standard does not require detailed factual allegations; it must be more than a defendant-unlawfully-harmed-me accusation.[36] When reviewing a motion to dismiss, the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[37] To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must show that the grounds of his entitlement to relief amount to more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.[38]

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[39] The plausibility standard is not akin to the probability standard but requires more than the sheer possibility that a

---

[33] *Id.* ¶ 21(n).
[34] SAC ¶ 21(x).
[35] *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).
[36] *Id.*
[37] *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018).
[38] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).
[39] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

defendant acted unlawfully.[40] Two principals underlie the *Twombly* standard. First, a court's acceptance of a complaint's allegations as true is inapplicable to legal conclusions, and threadbare recitals of cause of action elements, supported by conclusory statements, will not suffice.[41] Second, determining whether a complaint states a plausible cause of action requires the court to rely on its experience and common sense.[42] *Twombly* requires that a pleading nudge claims "across the line from conceivable to plausible."[43]

The Third Circuit follows a three-step process to determine the sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[44]

The relevant record under consideration consists of the complaint and any document integral to the complaint.[45] When considering a motion to dismiss, "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."[46] The movant carries the burden of showing that the dismissal is appropriate.[47]

---

[40] *Id.* at 678.

[41] *Id.*

[42] *Id.*

[43] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 570).

[44] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).

[45] *In re Tropicana Entertainment, LLC*, 520 B.R. 455 (Bankr. D. Del. 2014) (citing *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2012).

[46] *Id.* (citing *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).

[47] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 408 (D. Del. 2007).

## DISCUSSION

### I.    Background of the WARN Act

"The WARN Act was enacted in response to significant worker dislocation that occurred throughout the 1970s and 1980s when '[a]s companies were merged, acquired, or closed, many employees lost their jobs, often without notice.'"[48] "To ensure that laid-off workers and their families receive 'some transition time to adjust to the prospective loss of employment,' the Act requires employers to give sixty days' notice to all affected employees or their representatives prior to a mass layoff or a plant closing."[49] "Employers violating the Act are liable for back pay and benefits."[50]

The WARN Act defines "employer" as "any business enterprise that employs . . . 100 or more employees."[51]  The Complaint alleges that immediately prior to the mass layoffs, HMR employed approximately 400 employees at HMR's California Facility and 187 in HMR's Rhode Island facility, and 88 in HMR's Texas facility.[52]  The Complaint properly pleads that HMR was an employer that must comply with the federal WARN Act.[53]

An employer's bankruptcy, however, can muddle a WARN Act analysis.  As described by one court:

> The typical WARN Act case arises when a company decides for cost-saving or unionization reasons to close a plant and move its operations elsewhere. In those instances, the employer is aware of the impending move well before it occurs and is in a position to either give employees the required notice, or if it chooses otherwise, to pay the sixty days of a worker's lost wages and benefits. Bankruptcy is the atypical case. In the context of an impending bankruptcy, a

---

[48] *In re AE Liquidation, Inc.*, 866 F.3d 515, 523 (3d Cir. 2017) (quoting *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999)).

[49] *AE Liquidation*, 866 F.3d at 523 (quoting 20 C.F.R. § 639.1, citing 29 U.S.C. § 2102(a)).

[50] *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 (3d Cir. 2001) (citing 29 U.S.C. § 2104(a)).

[51] 29 U.S.C.S. § 2101(a)(1).

[52] SAC ¶¶ 15, 17.

[53] *See* 29 U.S.C. § 2101(a)(1).

WARN Act notice may hasten the collapse of the business by undermining management's best efforts to salvage it.[54]

When a plant closure results from the corporate employer's insolvency, workers may have difficulty recovering WARN Act damages from the insolvent or dissolving employer.[55] "As a result, WARN Act plaintiffs have pursued a variety of entities related to their direct employer, including parent corporations and lenders, on the theory that the related entities actually controlled the employer and should be treated as an employer for WARN Act purposes."[56] Here, the Plaintiffs seek to impose single employer liability on the Arlon Defendants. The question now presented is whether the Plaintiffs have now alleged facts sufficiently plausible to entitle them to demonstrate that the Arlon Defendants, together with HMR, acted as a "single employer" for WARN Act purposes.

## II.    The Second Amended Complaint does not contain sufficient facts to allege a plausible claim for single employer liability

"Affiliated corporate liability under the WARN Act is ultimately an inquiry into whether the two nominally separate entities operated at arm's length."[57] "The standard for inter-corporate liability under the WARN Act rests on whether the relevant companies have become 'so entangled

---

[54] *Cleary v. American Capital, Ltd.*, 59 F. Supp. 3d 249, 253 (D. Mass. 2014). The *Cleary* Court also noted that "the WARN Act allows for exceptions to the notice requirement in the instance of either a 'faltering business' or an 'unforeseeable business circumstance. If an exception is found to apply, the employer is only required to give 'as much notice as is practicable.'" *Id.* at 253 n.9 (citing 29 U.S.C. §§ 2102(b)(1)-(2); 20 C.F.R. § 639.9). As in *Cleary*, the exceptions are not at issue for purposes of the current motion to dismiss.

[55] *Azzata v. Am. Bedding Indus., Inc. (In re Consol. Bedding, Inc.)*, 432 B.R. 115, 120 (Bankr. D. Del. 2010).

[56] *Id. See also Pearson*, 247 F.3d at 476-47 ("Because a plant closure often presages a corporation's demise, leaving workers with no source of satisfaction from their employer, plaintiffs have frequently sought damages from affiliated corporations.").

[57] *Pearson*, 247 F.3d at 495.

with [one another's] affairs' that the separate companies 'are not what they appear to be, [and] in truth they are but divisions or departments of a single enterprise."[58]

To assist in a single employer analysis, the Third Circuit adopted the five-factor balancing test promulgated in a Department of Labor ("DOL") regulation.[59]   A court should consider: (1) common ownership, (2) common directors and/or officers, (3) a unity of personnel policies emanating from a common source, (4) dependency of operations, and (5) de facto exercise of control.[60]   These factors are not exhaustive, and "as with any balancing test, a number of circumstances not specifically enumerated may be relevant."[61]

The Arlon Defendants do not dispute that the first two factors (common ownership and common directors and/or officers) are met here.[62]   However, the first two factors alone do not establish that the related entities acted as a single employer.[63]   Accordingly, the Court begins its analysis with the third factor considered under *Pearson*.

### A. *Plaintiffs Did Not Plausibly Allege that the Arlon Defendants Shared a Unity of Personnel Policies with HMR*

In analyzing whether two or more companies share a "unity of personnel policies emanating from a common source," the *Pearson* Court instructs that a court must focus "less on the hierarchical relationship between the companies . . . than on whether the companies actually

---

[58] *Czvzewski v. Sun Capital Partners, Inc. (In re Jevic Holding Corp.)*, 526 B.R. 547, 552 (D. Del. 2014).

[59] *Pearson*, 247 F.3d at 477-78. DOL regulations issued under the WARN Act provide that two or more affiliated companies may be considered a single business enterprise for WARN Act purposes. *In re APA Transport Corp. Consol. Litig.*, 541 F.3d 233, 242 (3d Cir. 2008) (citing 20 C.F.R. § 639.3(a)(2)). In *Pearson*, the Third Circuit also determined that the five factors were appropriate for determining WARN Act liability for lenders, in addition to affiliated corporations. *Id.* at 494-95.

[60] *Id.* at 483.

[61] *Id.* at 478.

[62] Tr. 5/23/2018 at 7:2-5 (Adv. D.I. 93).

[63] *APA Transport*, 541 F.3d at 243 ("However, the factors are not balanced equally: the first and second factors, common ownership and common directors and/or officers, are not sufficient to establish that two entities are a 'single employer.'").

functioned as a single entity with regard to its relationship with employees."[64]   In particular, the court should consider how the personnel policies are implemented on a "regular, day-to-day basis,"[65] including whether the companies "engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping."[66]

In analyzing whether HMR and the Arlon Defendants shared a unity of personnel policies, the Court considers the following factual allegations made in the Complaint:

- The [HMR Directors] "handpicked and hired" HMR's CEO, Lewis McLeod,[67] and then replaced McLeod with a new CEO, Joe Rainert, approximately one month before the mass layoff(s), without first seeking prior approval from HMR's Board.[68]   Rainert had a long-standing employment relationship with Arlon prior to being hired, and viewed Dutton as his boss.[69]

- Arlon and AFAP, through the [HMR Directors], controlled and set terms and conditions of employment and compensation for management employees of HMR.  One such HMR management employee indicated that he was happy to join the "Arlon Team" after negotiating his HMR executive employment terms with one of the [HMR Directors].  In describing his employment terms, the same HMR management employee stated that "Arlon" had offered him a severance as a quid pro quo for agreement not to compete against HMR. Another prospective HMR management employee in 2016 could not be provided her proposed compensation package until Arlon calculated and approved what it should be.[70]

- In 2016, the [HMR Directors] interviewed prospective hires to fill the position of HMR's head of sales and marketing.  Upon the [HMR Directors]' final approval, their preferred candidate was hired.[71]

- An HMR executive, who was the head of business and . . . product development, had not been laid off as of May 2, 2016 but had been asked to take some time off.  The HMR executive called Dutton on May 2, 2016 to ask

---

[64] *Pearson*, 247 F.3d at 499.

[65] *Id.* at 490.

[66] *APA Transport,* 541 F.3d at 245 (citing *Vogt v. Greenmarine Holding*, 318 F. Supp. 2d 136, 142-43 (S.D.N.Y. 2004)).

[67] SAC ¶ 21(r).

[68] *Id.* ¶ 21(n).

[69] *Id.*

[70] *Id.* ¶ 21(m).

[71] *Id.* ¶ 21(i).

what was to become of his job. Dutton told the HMR executive that there was no place in the company for "an expensive developer." The HMR executive received his notice of termination a few days later.[72]

The foregoing allegations focus on the HMR Directors' setting employment terms and hiring HMR's CEO and executive management employees. In *Pearson*, the Court of Appeals for the Third Circuit indicated that control over executive management does not satisfy this factor. *Pearson* considered whether former employees of CompTech, a defunct company, could pursue WARN Act liability against GECC, CompTech's major secured lender.[73] Under the terms of the loan agreement, a majority of CompTech's shares transferred to GECC upon CompTech's default,[74] and GECC then voted to install a new slate of directors and a new CEO.[75] GECC also asked CompTech to hire an industry consultant to "help assess the Company's ongoing cash needs and determine the appropriate account strategy for GECC going forward."[76] The *Pearson* Court determined that GECC's control over the hiring and firing of the company's president and chief executive officer, and monitoring the hiring of a few other high-level managers was "not enough to find a 'unity' of personnel 'policy.'"[77]

Similarly, here, the allegations about the Arlon Defendants' hiring, firing and negotiating terms of employment for HMR's executive management positions do not demonstrate a unity of personnel policies regarding HMR's day-to-day operations.

The Second Amended Complaint also contains the following allegations about personnel practices:

---

[72] *Id.* ¶ 21(aa).
[73] *Pearson*, 247 F.3d at 477.
[74] *Id.*
[75] *Id.*
[76] *Id.* at 481.
[77] *Id.* at 499-500.

- Upon the loss of business from HMR's primary client, the [HMR Directors] advised HMR's CEO that "the best path forward" was the reduction of personnel.[78]

- The [HMR Directors] instructed HMR's CEO to conduct mass layoffs following their failure to repair the relationship with HMR's primary client.[79]

The Third Circuit also considered the unity of personnel policies factor in *APA Transport*.[80] Although the employer and the related company in *APA Transport* shared certain benefit plans and some employee monitoring functions (such as background checks), the court concluded there was no evidence that the companies operated as a single entity with regard to employees.[81] "Employees were hired and fired independently; reported separately to supervisors at their respective companies; were paid from separate payrolls; reported tax obligations to the federal government under separate ID numbers . . . and had separate labor contracts."[82]

The preceding two allegations, accepted as true for purposes of the motion to dismiss, concern discrete employment issues in a special, or even crisis, situation. They do not allege facts concerning HMR's day-to-day operations.[83]

The unity of personnel policies factor weighs against allowing a single employer liability claim against the Arlon Defendants.

---

[78] SAC ¶ 21(w).

[79] SAC ¶ 21(x).

[80] *In re APA Transport Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008)

[81] *Id.*

[82] *Id.*

[83] The allegation that the HMR Directors ordered HMR's CEO to conduct mass layoffs is more appropriately considered as part of the "de factor exercise of control" factor, discussed *infra*, rather than the unity of personnel policies factor. *Pearson*, 247 F.3d at 500.

**B.** *Plaintiffs Did Not Plausibly Allege that HMR Had a Dependency of Operations with the Arlon Defendants*

A dependency of operations may exist between two corporations if there is an "interrelation of operations."[84]  "When examining the 'interrelation of operations' factor, courts generally consider the existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances."[85]  An interrelation of operations does not exist simply because there is an alleged "agency" relationship between a borrower and lender, or a parent and a subsidiary; "plaintiffs must submit evidence of far more oversight and control on the part of the principal."[86]  One company's "[c]ontrol over the day-to-day operations [of another] has been held to be indicative of interrelation of operations."[87]  "However, the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations."[88]

In deciding whether the Plaintiffs sufficiently allege a dependency of operations between HMR and Arlon Defendants, the Court considers the following facts alleged in the Complaint:

- Arlon and AFAP, through the [HMR Directors], interacted on a weekly, if not daily, basis with HMR during which [they] instructed HMR on operations, regulatory, compliance, and communications with regulatory agents and HMR's primary client.[89]

- The [HMR Directors] visited HMR facilities, and the HMR executives understood that Arlon and AFAP controlled HMR, and recognized the [HMR Directors] as the ultimate decision- makers for HMR.[90]

---

[84] *Pearson*, 247 F.3d at 500.
[85] *Id.* (citations omitted).
[86] *Id.* at 503.
[87] *Id.* at 501.
[88] *Id.*
[89] SAC ¶ 21(i).
[90] SAC ¶ 21(j), (k), and (l).

15

- Arlon and AFAP, through the [HMR Directors], controlled and set terms and conditions of employment and compensation for management employees of HMR.[91]

- In March 2016, Arlon's investment committee approved HMR's request for a cash infusion of $7,400,000, but released less than half of the amount even though the [HMR Directors] knew that "HMR desperately need[ing] the remainder of the cash infusion to continue operations at the facilities."[92]

The *Pearson* plaintiffs claimed that a dependency of operations existed because CompTech's CEOs acted as GECC's agents when (among other things): (i) GECC controlled the hiring and firing of the CompTech CEOs,[93] (ii) GECC required CompTech to hire a consultant to work closely with the CEO,[94] and (iii) CompTech's CEOs asked GECC to approve certain corporate actions. The Third Circuit decided that "dependency of operations cannot be established by the parent corporation's exercise of its ordinary powers of ownership, i.e., to vote in directors and set general policies."[95] Even though the CEOs sought GECC's approval of "actions involving large-scale expenditures, restructuring, or the disposition of equipment in which GECC retained a security interest,"[96] no dependency of operations was shown because GECC merely approved or disapproved such requests - - as was its right as a parent or lender - - but was not involved in the details or manner of implementing CompTech's business plans.[97]

The Plaintiffs here allege that the Arlon Defendants' engaged in "weekly," if not "daily" control of HMR. But the specific activities described (such as advising about regulatory duties,[98]

---

[91] SAC ¶ 21(m).
[92] SAC ¶ 21(h).
[93] *Id.* at 479, 501.
[94] *Id.* at 501.
[95] *Id.*
[96] *Id.* at 502.
[97] *Id.*

[98] *Czyzewski v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*, 492 B.R. 416, 432 (Bankr. D. Del. 2013) (deciding there was no dependency of operations when the lender/equity holder provided financial and management consulting services for the debtor pursuant to a Management Services Agreement, and was compensated for the work). The Arlon Defendants claim that a management services agreement existed

reviewing financial information on a weekly basis, visiting facilities, and negotiating executive management compensation) are consistent with the HMR Directors' duties as board members, and the Arlon Defendants' ordinary powers of ownership. A dependency of operations does not arise through supervising the debtor's activities or placing representatives on the debtor's board of directors.[99] Instead, there must be a "high degree of integration" so that the debtor relies on the lender or related corporation for the ordinary operation of its day-to-day business.[100] Here, there are no allegations that the Arlon Defendants and HMR shared administrative or purchasing services, interchanged employees or equipment, or commingled bank accounts or finances.[101]

The Plaintiffs here also allege that HMR was financially dependent on Arlon because HMR could not continue its operations without release of the full cash infusion that was approved by Arlon's investment committee. In *Pearson*, the Court dismissed the plaintiffs' financial dependency argument, noting "there is nothing to suggest that GECC's loans to CompTech were anything other than bona fide arm's length transactions."[102] The *Pearson* Court reasoned: "[w]e surely do not want to discourage companies from attempting to keep their subsidiary operations afloat with temporary loans by holding that the mere fact that loans were even necessary establishes a 'dependency of operations' giving rise to liability."[103] Similarly, here, there are no allegations of irregularities regarding Arlon's agreement to provide a cash infusion to HMR.

---

here, but the Plaintiffs did not reference it in the Second Amended Complaint. For purposes of deciding this motion to dismiss, I need not consider the management services agreement.

[99] *Consolidated Bedding*, 432 B.R. at 124.

[100] *Id.* (citing *Pearson*, 247 F.3d at 497).

[101] *APA Transport*, 541 F.3d at 245. *See also Jevic Transp*, 492 B.R. 416, 432 (Bankr. D. Del. 2013) (deciding there was no dependency of operations between the debtor and the lender/equity holder when it was "undisputed that [the debtor] maintained separate books and records, had its own bank accounts, and prepared its own financial statements.").

[102] *Pearson*, 247 F.3d at 503.

[103] *Id.*

17

Arlon's decision not to release all of the funds to HMR does not, on its own, plausibly allege financial dependency.

The Plaintiffs have not alleged facts that would plausibly support a claim of dependency of operations between HMR and the Arlon Defendants. This factor also weighs against single employer liability.

### C. Plaintiffs Did Not Sufficiently Allege the Arlon Defendants' De Facto Exercise of Control over HMR

"The core inquiry of the *de facto* exercise of control factor is 'whether the parent [or lender] has specifically directed the allegedly illegal employment practice that forms the basis for the litigation."[104] In *Pearson*, the Third Circuit warned that this factor could be problematic "because [if] read in isolation, it might well encourage the imposition of liability merely as a result of the control ordinarily exercised by a parent corporation over a subsidiary by virtue of its ownership."[105] Courts must be:

> scrupulous in [their] efforts to distinguish between situations in which a parent/lender has ultimately assumed responsibility for the continuing viability of a company (thus incurring liability for WARN Act violations) and situations in which the borrower has retained the ultimate responsibility for keeping the company active.[106]

My colleagues have ruled on this issue post-*Pearson*. In *Tweeter Opco*, Judge Walrath decided that the plaintiff established de facto control by a company with "significant indirect ownership interests"[107] in the debtor when the head of that related company repeatedly called for reductions in the debtor's payroll to increase profits, ordered the terminations of the debtor's

---

[104] *D'Amico v. Tweeter Opco, LLC (In re Tweeter Opco, LLC)*, 453 B.R. 534, 543 (Bankr. D. Del. 2011) (quoting *Pearson*, 247 F.3d at 491). *See also APA Transport*, 541 F.3d at 245 (de facto exercise of control factor looks at who was the decision-maker responsible for the employment practice giving rise to the litigation).

[105] *Pearson*, 247 F.3d at 490.

[106] *Id.* at 505.

[107] *Tweeter Opco*, 453 B.R. at 542.

employees,[108] and had its own inside counsel directly involved in terminating the debtor's employees.[109] In fact, the *Tweeter Opco* Court found the de facto control in that case was "particularly egregious."[110]

On the other hand, in *Consolidated Bedding*, Judge Shannon determined that the plaintiff had not pled sufficient facts showing that the debtor's "primary financier and equity holder" (American Capital or "AmCap") exercised de facto control over the debtor's decision to close its facilities.[111] Although AmCap supervised much of the debtor's activities, and AmCap's employees occupied seats on the debtor's board of directors, the debtor remained a "separate business entit[y] that did not rely on American Capital for day-to-day operations."[112] The *Consolidated Bedding* Court rejected the debtor's conclusory allegations that the AmCap directors "were wearing their American Capital 'hats' while making difficult decisions on for the [d]ebtors to close the Facilities and file for bankruptcy."[113]

Here, the Plaintiffs' allegations do not provide enough *facts* to support a plausible claim of de facto control. For example, the Plaintiffs make the following conclusory allegations that the Arlon Defendants, acting through the HMR Directors, made decisions or controlled HMR while wearing their Arlon hats and did not act in the best interests of HMR:

---

[108] The *Tweeter Opco* Court noted that "[i]t is undisputed that on October 4, 2008, Tim O'Brien (a director of the Debtor and SAM-employed analyst) told the then-CEO of the Debtor" that the main equity owner of a number the related companies wanted the Debtor "to terminate half of the Debtor's employees at the Massachusetts corporate center." *Tweeter Opco*, 453 B.R. at 543-44. The same director/analyst, O'Brien, sent an email to the Debtor's employees about the termination of the Debtor's CEO, stating "unfortunately due to this economic environment, coupled with the poor performance of the firm, we felt we needed tighter control of Tweeter within our own organization." *Id.* at 544.

[109] *Id.* at 545.

[110] *Id.*

[111] *Azzata v. Am. Bedding Indus., Inc. (In re Consol. Bedding, Inc.)*, 432 B.R. 115, 124 (Bankr. D. Del. 2010).

[112] *Id.* at 124.

[113] *Id.* at 122, 124.

- At all relevant times, the [HMR Directors] composed a controlling majority of the board of directors of HMR. At all relevant times, and specifically with regard to the WARN [Act] violation alleged herein, the [HMR Directors] consistently acted in their roles as principals or officers of Arlon and in the interest of and on behalf of Arlon, AFAP, and, their parent, Continental Grain Company, in managing HMR rather than acting through their roles as directors of HMR and rather than acting in the interests of HMR.[114]

- On or about May 1, 2016, Arlon and AFAP, through the [HMR Directors], instructed Rainert to conduct a mass layoff or shutdown at each of the Facilities following the [HMR Directors]' failed attempt to repair the long-damaged relationship with HMR's primary client.[115]

- The instruction to terminate the Class members through a mass layoff, plant closing or "termination" at the Facilities, without proper WARN [Act] notice, was given by Arlon and AFAP, through the [HMR Directors] in their capacities as representatives of Arlon and AFAP, and in the interest of Arlon, AFAP and, their parent, Continental Grain Company, not as board member of HMR, nor in the interests of HMR.[116]

The presence of the Brooks, Dutton and Weiner on HMR's board of directors does not, on its own, demonstrate that the Arlon Defendants exerted de facto control over HMR.[117] Nor can I correlate the decision to close the Facilities with the Arlon Defendants simply because of the HMR Directors' board membership. "[I]t is hornbook law that 'the exercise of the 'control' which stock ownership gives to stockholders . . . will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders.'"[118]

The Plaintiffs also allege that the HMR Directors selected a CEO just prior to closing the Facilities who, together with the HMR Directors, decided to shut down the Facilities, as follows:

---

[114] SAC ¶ 21(e).
[115] SAC ¶ 21(x).
[116] SAC ¶21(z).
[117] *Czvzewski v. Sun Capital Partners, Inc. (In re Jevic Holding Corp.)*, 526 B.R. 547, 554 n. 9 (D. Del. 2014) (absent a showing that shared directors retained their original allegiance while making difficult decisions for the debtors, mere service on both boards does not show de facto control)).
[118] *Cleary*, 59 F. Supp. 3d at 256 (quoting *United States v. Bestfoods*, 524 U.S. 51, 61-62, 118 S. Ct. 1876, 141 L.Ed.2d 43 (1998)).

- Arlon and AFAP, through the [HMR Directors], replaced HMR's CEO approximately one month before commencing the mass layoff(s) or plant closing(s) at the Facilities, with Joe Rainert. Rainert had a long-standing employment relationship with Arlon prior to being handpicked and hired by the [HMR Directors] as the final CEO of HMR. The [HMR Directors] hired Rainert without even seeking prior approval by the HMR Board. Before and as he became the CEO of HMR, Rainert knew that the [HMR Directors] expected him to act in the interests of Arlon, AFAP and, their parent, Continental Grain Company, rather than HMR. Rainert viewed John Dutton as his boss, by virtue of John Dutton's position with Arlon. Rainert even told HMR's primary client in an email sent on May 1, 2016 (just weeks after Rainert had been installed as HMR's CEO by Arlon and AFAP) that John Dutton was his "boss" and that Rainert had worked with Dutton for many years. Rainert did not view the [HMR Directors] as being representatives of HMR, but instead viewed them as representatives of Arlon and answered to them on that basis.[119]

- At or about the time of the mass layoff(s) at or shutdown of the Facilities in May 2016, Rainert even described the ultimate decisionmakers at HMR as the "Arlon Board" and indicated that ultimate approval for all decisions at HMR had to come from the "Arlon Board."[120]

- After the decision by HMR's primary client to discontinue business with HMR, Brooks stated to Rainert that reductions in personnel were the best path forward.[121]

The Defendants argue that the foregoing allegations do not support de facto control because (i) the allegations contain purported subjective perceptions of Rainert, rather than facts showing that the Arlon Defendants controlled Rainert or HMR; and (ii) the alleged actions taken by the HMR Directors (and reference to them as Rainert's "boss") are consistent with their duties as HMR board members and, therefore, cannot support a plausible claim of control. I agree.

Decisions analyzing single employer liability under the WARN Act have recognized that lenders and parent corporations may take steps to protect their investments without incurring

---

[119] SAC ¶21(n).
[120] SAC ¶ 21(o).
[121] SAC ¶21(w).

liability.[122] "[T]he dispositive question is whether a creditor is exercising control over the debtor

beyond that necessary to recoup some or all of what is owed, and is operating the debtor as the

de facto owner of an ongoing business."[123]   These allegations describe that the HMR Directors

took appropriate actions and made difficult decisions as is often necessary for a company's

directors. Delaware law presumes that directors will act in accordance with their fiduciary duties,

and a plaintiff must allege particularized facts creating a reasonable doubt to rebut the presumption

at the pleading stage. [124]   There are no factual allegations from which I could infer that the HMR

Directors' actions went beyond those typically taken by directors attempting to save a business or

preserve value.[125]

Finally, the Plaintiffs include an allegation specifically alleging that the Arlon Defendants'

lawyer was directly involved in drafting a WARN Act notice:

- Arlon and AFAP's legal counsel drafted a belated, purported WARN [Act] notice for employees who were terminated as a result of the mass layoffs at or shutdown of the Facilities. The purported WARN [Act] notice was dated after the effective dates of the terminations of the Class members.[126]

However, this allegation claims that *after* HMR had already terminated its employees, the

Arlon Defendants' legal counsel drafted a belated WARN Act notice. The allegation does not

---

[122] "We do not intend to create a jurisprudence that discourages loans in general or rescues of troubled business enterprises in particular." *Pearson*, 247 F.3d at 502. "The law is not so foolish as to fashion a rule - - even under the laudable auspices of the WARN Act - - that would prevent an equity investor . . . from taking measures to protect or, if necessary, salvage its shareholders' stake in an investment going bad." *Cleary*, 59 F. Supp. 3d at 258.

[123] *Cleary*, 59 F. Supp. 3d at 258 (quoting *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 150 (2d Cir. 2007)).

[124] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004).

[125] "Where a complaint pleads fact that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

[126] SAC ¶21(y).

22

plausibly claim that the Arlon Defendants' counsel was directly involved prior to closing the Facilities. Moreover, this single act by a parent corporation after HMR's mass layoff is not the type of day-to-day occurrence that would evidence a de facto control, and thus, impose single employer liability.

### D. *Conclusion on the Issue of Single Employer Liability under the WARN Act.*

Although there was common ownership and overlap of officers and directors between HMR and the Arlon Defendants, the Second Amended Complaint fails to allege specific facts demonstrating the remaining *Pearson* factors: (i) unity of personnel policies, (ii) dependency of operations, and (iii) de facto control. At the hearing on the motion to dismiss the First Amended Complaint, I engaged Plaintiffs' counsel in the following colloquy:

> THE COURT: [T]he trustee has produced 50,000 pages of documents, if I gave you leave to amend the complaint, what else could you tell me?
>
> . . . .
>
> I'm trying to figure out the uniqueness of this situation, and it hasn't struck me yet.
>
> COUNSEL: If it would assist Your Honor in determining whether we've tipped the scales in favor of facts that are not conclusory, we could provide more detail on the emails relating to direction . . . with regard to regulatory communications and communication with the client, and other issues like that.[127]

I then granted the motion to dismiss the First Amended Complaint, with leave to amend. However, the allegations in the Second Amended Complaint continue to lack sufficient specificity to support a plausible claim for single employer liability.

### III. The Second Amended Complaint does not contain sufficient facts to allege a plausible claim for employer liability under the California WARN Act

Following the enactment of the federal WARN Act, California's state legislature enacted the California WARN Act to supplement the federal WARN Act by providing "stronger worker

---

[127] Tr. 8/18/2017 at 24:11-14; 26:4-9 (Bankr. D.I. 225).

protections."[128]  The Second Amended Complaint seeks to hold the Arlon Defendants liable as "employers" under the California WARN Act. They allege (in pertinent part):

> At all relevant times, each Defendant was an "employer," as that term is defined in . . . California Labor Code §§ 1400 *et seq.* and continued to operate as a business until it ordered a mass layoff, plant closing or termination at each of the Facilities, as defined under the WARN Act.[129]

The California WARN Act defines "employer" as follows:

> "Employer" means any person, . . . who directly or indirectly owns and operates a covered establishment.  A parent corporation is an employer as to any covered establishment directly owned and operated by its corporate subsidiary.[130]

The Plaintiffs argue that the Arlon Defendants are liable for HMR's violations of the California WARN Act because they are HMR's parent corporations.  The Arlon Defendants argue that the California WARN Act does not impose "strict liability" upon parent corporations due to a subsidiary's violation of the Act.  I conclude that the Second Amended Complaint fails to allege sufficient facts to allow claims against the Arlon Defendants under the California WARN Act for two reasons.

First, I note that the Second Amended Complaint does not allege that Arlon is a "parent corporation" of HMR.  The term "parent corporation" is not defined in the California WARN Act, but it is generally recognized that "parent company" is a company that has a controlling ownership interest in another company.[131]  There are no allegations that Arlon has any ownership interest in HMR.  The Second Amended Complaint alleges that HMR's direct parent (HMR Foods, LLC) is

---

[128] *The Int'l Bhd. of Boilermakers. v. NASSCO Holdings Inc.*, 17 Cal. App. 5th 1105, 1122-23 (Cal. Ct. App. 2017).

[129] SAC ¶52.

[130] CAL. LAB. CODE § 1400(b).

[131] *See United States v. Bestfoods*, 524 U.S. 51, 62, 118 S.Ct. 1876, 141 L.Ed. 2d 43 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.") (internal punctuation and citations omitted).

100% owned by its sole member and parent, AFAP.[132] This does not allege that AFAP is HMR's direct parent, but I need not decide the issue of whether control through corporate layers is sufficient to satisfy a "parent corporation" requirement, because the plain language of the California WARN Act does not hold parent companies strictly liable for the subsidiaries' liability.

It is the Court's "fundamental task to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute."[133] A court should "focus on the statute's actual words, the most reliable indicator of legislative intent, assigning them their usual and ordinary meanings."[134]

The California WARN Act provides that "[a]n employer may not order a mass layoff, relocation, or termination at a covered establishment unless, 60 days before the order takes effect, the employer gives written notice of the order . . . ."[135] The plain language of this section, read in conjunction with the definition of "employer," provides that a parent corporation may also be liable *if it orders a shut down in violation of the Act*.[136] Assuming AFAP is a parent corporation for purposes of this motion, I have already determined that the Second Amended Complaint does not adequately allege facts to show that AFAP ordered the Facilities' closings. Instead, the Complaint alleges that the HMR Directors and CEO decided to close the Facilities.

The Arlon Defendants' motion to dismiss the California WARN Act claims will be granted.

---

[132] SAC ¶ 21(b).

[133] *Boilermakers,* 17 Cal. App. 5th at 1114.

[134] *Id.*

[135] CAL. LAB. CODE § 1401(a).

[136] This result becomes apparent if we replace the word "employer" with "parent company" in § 1401(a) so that the provision reads: a parent company may not order a mass layoff, relocation, termination at a covered establishment unless, 60 days before the order takes effect, the parent company gives written notice of the order.

## **CONCLUSION**

As required by *Twombly* and *Iqbal,* I have reviewed the Second Amended Complaint, disregarded the numerous conclusory allegations, and, relying on my experience and common sense, I have considered the remaining allegations in light of the five-factor balancing test adopted by the Third Circuit in *Pearson.*[137]   I have concluded that the allegations show that the Arlon Defendants, as a financier and an affiliated corporation, placed their representatives on HMR's board of directors to monitor the company.   The allegations further show that the HMR Directors took actions and made decisions consistent with their positions.   Accordingly, I conclude that Plaintiffs have failed to allege sufficient facts from which I may draw a reasonable inference that the Arlon Defendants could be liable as a single employer under the federal WARN Act or as an employer under the California WARN Act.

The Arlon Defendants' motion to dismiss the Second Amended Complaint will be granted. An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:  June 13, 2019

---

[137] *Iqbal*, 556 U.S. at 678.